## Rockcastle Lumber Company, et al. v. Burns, et al.

(Decided April 24, 1917.)

### Appeal from Harlan Circuit Court.

1. Liens—Priorities.—In a contract of sale of a saw milling plant, including the timber in the woods and lumber on the ground, wherein a lien is retained on the property sold, including that mentioned, to secure the deferred payments, but the privilege is given in the contract for the purchaser of the mill, and who owes the balance of the purchase price, to sell lumber that may be sawed, and which might remain upon the yards without reserving in the contract the obtaining of the consent of the seller and lien holder, if the former makes a bona fide sale of any such lumber in the usual course of business to one without knowledge of any objections from the lien holder, money advanced on such sales will be a prior claim as against the proceeds of the lumber to that of the seller and lien holder.

2. Liens—Priorities.—Although one advancing money to the purchaser of the mill by a contract made under the circumstances above, and in which the absolute title is stated to be purchased, may not be a purchaser of the complete title, still he is such to the extent of the money which he advances, and has a prior lien on the lumber upon which he made such advancements over that of the seller of the plant in whose contract the right in the operator of the mill to sell the lumber is given.

3. Liens—Advancements—Priorities.—Where, under a contract to advance ten dollars per thousand upon lumber, which is done, and the lumber stacked upon grounds covered by a lease transferred to the one who makes the advancements and marked in his name, and such one is to afterward sell the lumber and collect his advancements at an agreed compensation for his services, he is at least a factor, and if not in the actual possession of the lumber, he has constructive possession of it, and has a lien to the extent of his advancements and his agreed commissions which will prevail over that of the seller of the plant in which permission is given for the operator of the mill to sell the lumber.

4. Liens—Priorities.—A saw mill by which timber is manufactured into lumber is a manufacturing establishment within the provisions of section 2487 of the Kentucky Statutes, and one furnishing such material as is therein mentioned has a lien upon the property of the owner of the mill for the amount of his debt for materials so furnished; but in order to obtain priority such one must proceed to assert his lien within sixty days after the property has been assigned or been placed in the hands of a receiver or trustee, as is required by section 2491 of the Kentucky Statutes, but it is sufficient, if the claim shall be filed within such time, with the assignee or trustee or other person appointed to wind up the estate.

5. Liens—Limitation of Actions.—Where the creditors, as well as the debtor, agree to place the estate in the hands of a creditors' committee for the purpose of winding it up, this is tantamount to its being placed in the hands of a receiver or trustee, and in order to get the benefit of the lien provided by section 2487, either proceeding should be commenced within sixty days from the time of the appointment of the committee, or within that time the claim should be duly filed with such committee.

BULLITT & CHALKLEY, KEITH WISE and J. F. BULLITT for appellant, Rockcastle Lumber Company.

W. F. HALL for appellants, Harlan Wholesale Grocery Company and H. T. Hackney Company.

H. C. CLAY and R. T. IRVINE for appellees, McCorkle & Son.

N. R. PATTERSON for appellees, C. M. McClung & Company.

M. H. RHORER for appellee, Burns.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The questions involved in this appeal pertain to the priority of liens in and to the funds realized by a liquidating committee which had been agreed to and appointed by the various creditors of the Dione Lumber Company,

a corporation of Bristol, Virginia. The funds involved are the proceeds of the sale by the liquidating committee of lumber and other personal property belonging to that corporation, the selection and appointment of the committee having been made at a meeting of the creditors for that purpose on the 3rd day of February, 1914. Before addressing ourselves to the questions involved it is necessary that we make as brief a statement of the facts as possible for a proper understanding of the case.

On September 3, 1912, McCorckle & Son, a partnership located at Big Stone Gap, Virginia, and composed of M. C. and M. R. McCorckle, by written contract purchased a body of timber in Harlan county, Kentucky, from A. B. and D. B. Cornett, and subsequently installed a mill at Dione, Kentucky, not far from the timber, and constructed tramways and other appurtenances necessary for the cutting and delivering of the timber to the mill and sawing it into lumber. The mill site was not on the tract of land containing the timber, but had been leased from other parties. MCorckle & Son operated the mill until May 1, 1913, at which time they sold by written contract to M. H. Hoskins and Irving Whaley their timber contract with the Cornetts, the lumber they had on the mill yard and logs in the woods, together with the live stock and merchandise in a commissary store, and rights of way and leases, but retained the saw mill, machinery and equipment, the tram cars, steel rails and hoisting engine, it being understood at the time that the purchasers, Hoskins and Whaley, were to immediately organize a corporation that would assume the carrying out of the contract between McCorckle & Sons and themselves. The Dione Lumber Company was immediately organized for that purpose and began the operation of the mill. The chief stockholders of that corporation were Hoskins and Whaley, and they seem to have had but little if any funds. The price agreed to be paid McCorckle & Sons on the contract of May 1, 1913, was $17,000.00, $2,000.00 of which was paid in cash and the remainder by notes of different denominations and due at different times. An agreed rental was to be paid McCorckle & Son for the part of the equipment which they did not sell to Hoskins and Whaley, but the latter had the right, upon certain conditions or contingencies, to purchase that property at an agreed stipulated price. In the contract of McCorckle & Son is this provision:

"The said parties of the first part hereby expressly retain a lien on all the lumber which may be manufactured from the said tract of timber hereby assigned, and all the other property hereby sold, to secure the payment of the said notes, and the said parties of the second part agree that the value of the lumber manufactured from the said timber and remaining on the yard at the said Dione plant, together with the value of the timber remaining on said tract of land, shall at all times equal the amount of said deferred payments remaining unpaid. And it is agreed that for the purpose of arriving at the value of the timber remaining on said tract, same shall be based on a total estimated stumpage of 5,000 ft. to be valued at $3 per M. ft. And it shall be the duty of the parties of the second part, whenever requested so to do by the parties of the first part, to furnish to the parties of the first part a correct statement of the amount of timber cut from said tract, the amount of lumber on yard at said plant, the amount of lumber shipped and the amount of lumber sold but not shipped."

Hoskins and Whaley as managers of the Dione Lumber Company and its principal owners, realizing that it would be impossible to operate the mill without funds, shortly after the organization of the corporation began an effort to effect some character of arrangement by which they could procure sufficient funds to operate the mill and work up the timber which they had purchased under the Cornett lease. These efforts resulted in the Dione Lumber Company (to which we shall hereafter refer as the lumber company) entering into a contract with the Rockcastle Lumber Company (to which we shall hereafter refer as the Rockcastle company) on the 29th day of May, 1913, by the terms of which the lumber company agreed to sell to the Rockcastle company as much as 500,000 feet of lumber, sawed and stacked on the yard, and to be sawed and stacked, upon which the Rockcastle company was to make an advancement of $10.00 per thousand, and to be entitled to $2.00 per thousand as commission, and six per cent interest on the money advanced, all of which was to be refunded when resold the lumber and collected therefor.

This contract was afterwards enlarged so as to increase the amount of lumber on which the Rockcastle company might make advancements under the same terms. It was furthermore agreed that the lumber company should furnish to the Rockcastle company a lease

for grounds on which the lumber upon which advancements were made might be stacked, and which stacks were to be marked as Rockcastle lumber. It was also agreed that the lumber company should insure the lumber upon which advancements were made, which policies should be made payable to the Rockcastle company so as to cover the amounts due it for the items provided for in the contract. At the time of the making of that contract there was lumber upon the mill yards of the lumber company of the character covered by the contract to the amount of 225,700 feet, and upon which at the time of the contract there was advanced by the Rockcastle company $2,257.00. It continued to make advancements under the terms of that contract and extensions thereof until the total sum advanced by it to the lumber company was $11,046.18, but it had sold of the lumber a sufficiency to realize $6,643.67, leaving a balance due it on February 3, 1914, of $4,402.51. In the meantime, while the lumber company was operating its plant it made payments to McCorckle & Son until on February 3, 1914, when it ceased to operate, their debt was reduced to $9,000.00 with interest.

Prior to the date last mentioned the appellant, Harlan Wholesale Grocery Company, filed suit against the lumber company on a claim for groceries which it had furnished for the commissary department of the lumber company amounting to $1,692.34, and the appellant, the H. T. Hackney Company, had also, prior to that date, but after the filing of the grocery company suit, filed suit against the lumber company to recover the balance of an account due it from the lumber company amounting to $628.29. Both of these companies procured orders of attachment against the property of the lumber company and had them served upon all of its property, and afterwards took judgment for their claims and an order sustaining their attachments. There were a number of other attachment suits filed against the lumber company by various other creditors, and with matters in this condition a meeting of the creditors of the lumber company was had on February 3, 1914, at which it was agreed between it and all of its creditors that the affairs of the company be turned over to M. H. Rohrer, B. B. Burns and M. C. McCorckle, as a creditors' committee, with power and authority in the committee to take possession of all of the property, although attached, and to operate the mill and saw up the remaining amount of the stand-

ing timber and to pay certain acknowledged preferred debts, including that to the Cornetts, from whom the timber was purchased on a stumpage basis, and to convert all of the assets of the lumber company into cash. This agreement was effected under the belief that by working up the timber sufficient assets might be realized to at least meet the entire indebtedness of the lumber company and thereby result in profit to all parties concerned.

It would serve no useful purpose to encumber this opinion with setting out all of the acts which the committee did while in charge under that agreement, or what was realized by it either from the operation of the mill or the sale of lumber on hand at the time, or other items of property owned by the lumber company. Suffice it to say that it soon became apparent that there was not as much timber in the woods as the parties had anticipated, and that the operation of the plant was resulting in but little if any profit, and the Cornetts were settled with by conveying back to them the remaining portion of the timber and the other property sold and converted into cash, which, pursuant to agreement, was deposited in the name of the committee. Disputes having arisen between the creditors as to the priority of liens which some of them claimed in the proceeds as against others, the committee filed suit making the lumber company and other creditors parties, setting out the facts and stating the contentions of each creditor, to which petition the various creditors, including the Rockcastle company, responded by appropriate pleadings and insisted upon their priorties. The suits of the Harlan Grocery Company and that of H. T. Hackney & Company were consolidated with the suit filed by the committee. In the meantime, the appellee, C. M. McClung & Company, which is a Tennessee corporation, located at Knoxville, Tennessee, had filed suit in the Bell circuit court against the lumber company, the committee, and all other creditors of that company, seeking to enjoin the committee from removing any of the funds in its hands from the state of Kentucky, and to recover judgment against the lumber company for the sum of $827.53, which it claimed was due it for supplies and material furnished the lumber company while it was operating the plant, and which were necessary for it to operate its lumber manufacturing establishment. In that suit it claimed a superior lien against certain property of the lumber company, which lien it as-

serted its right to under the provisions of section 2487 of the Kentucky Statutes. That suit was afterwards dismissed, and the same pleading, or a copy thereof, was filed in the Harlan circuit court as an answer and cross-petition to the suit filed by the committee, and in which the same lien claim was made. Appropriate pleadings controverting the affirmative allegations of the different creditors' contentions as to priority of liens were filed and upon final submission of the cause the court adjudged that McCorckle & Son had a prior lien upon the proceeds of the lumber company on hand at the time it took charge, and upon which the Rockcastle company had made advancements, to that claimed by the latter company, and from that judgment the Rockcastle company prosecutes this appeal.

At the same term of the court, but upon a subsequent day, it was adjudged that on the proceeds of the sale by the committee of the commissary stock of the lumber company, some cattle, and perhaps other articles of personal property, McClung & Company had a superior lien for its debt to that of the Harlan Grocery Company and Hackney & Company as between them and McClung & Company, and from that judgment the two former companies appeal. We will as briefly as possible consider the questions arising upon the two appeals in the order mentioned.

First. McCorckle & Son claimed a superior lien on the fund produced by the sale of the lumber on the yard at the time the committee took charge, which was located on land the lease to which had been transferred to the Rockcastle company, and stacked in piles marked with its name. This claim is based upon that portion of its contract with Hoskins and Whaley which we have hereinbefore copied, which contract, together with the one the Rockcastle company had made with the lumber company, were each acknowledged by the parties thereto and recorded at the times they were made. This contention is resisted by the Rockcastle company upon the grounds, (a) that in the McCorckle & Son contract with Hoskins and Whaley it was agreed that the value of the lumber which the latter might manufacture, plus the value of the timber remaining on the Cornett tract of land, should at all times equal the amount of the deferred payments of McCorckle & Son's indebtedness, and that for the purposes of arriving at the value of the timber remaining on the land it should be estimated at five million feet of the

value of three dollars per thousand, which would be fifteen thousand dollars, and itself be sufficient to pay the deferred debts of McCorckle & Son; it being insisted that the latter are estopped as against a third party who dealt with the lumber company to deny or contend otherwise than that there was that amount of lumber standing in the trees and worth the price fixed in the contract. (b) That by the terms of that contract the lumber company were compelled, when requested, to make a report to McCorckle & Son of the amount of lumber on hand, the amount cut, the amount sold and shipped, and the amount *"sold but not shipped,"* and that this gave authority to the lumber company to sell lumber upon its yards and to invest the purchaser with a good title, although the lumber might *not* be shipped; and (c) that before the Rockcastle company furnished any money to the lumber company under its contract to do so McCorckle & Son not only had knowledge of that fact, but consented that it might be done.

As to the first ground of resistance, (a), we are not inclined to give the effect to the language of the contract sought to be put upon it by counsel for the Rockcastle company. The language of the contract raising this question is but an estimate made by the parties, and is in no sense a guarantee of its correctness. It was evidently put into the contract for the purpose of convenience, but even if it should be considered otherwise in order for it to be a valuable security the prices of standing timber would have to remain the same, or at least not decline, and in order to realize from it great expenses would have to be incurred and possible contingencies overcome. So that, looking at the matter in the most favorable light from the viewpoint of the Rockcastle Lumber Company, we are not disposed to place the interpretation upon that part of the McCorckle contract insisted upon by its counsel.

A different question, however, is presented by the insistence made to contention (b). The language of the McCorckle contract evidently contemplates that Hoskins and Whaley, or their successor, the lumber company, could sell lumber and *not ship it.* In other words, that it might stack lumber which it sold upon its yards, and if authority is so given by McCorckle & Son, which we think their contract does, it would enable them to perpetrate a gross fraud upon the purchaser of any of the lumber who may have in good faith paid for it, even after

having examined McCorckle & Son's ·contract, if they could still assert their supposed superior lien against that same lumber for a sufficient sum to consume its entire value, and thus cause the purchaser to lose the entire sum paid for it. We are acquainted with no rule of law permitting this to be done. On the contrary, it is the delight of equity to do justice between parties and to require each litigant to lie on the bed which he has made for himself. In this case, as the record will show, it was evidently within the contemplation of the parties to the McCorckle & Son contract that Hoskins and Whaley, or their successor, the lumber company, would necessarily have to sell lumber not only for the purpose of continuing the operation of the saw mill, but for the purpose of obtaining funds to meet the deferred payments due McCorckle & Son, and from the language, *supra*, of the contract such sales might be made without the lumber being moved from the mill yard. Until the rules governing the application of equitable principles shall be changed, we are unwilling to sanction any course by which a lien holder may enable his debtor to procure funds with which to reduce the debt through a sale of the property and then to absorb the property from which those funds are realized by the assertion of his alleged prior lien. Such a doctrine, according to our view, would be so repugnant to equitable principles as to relieve us from citing authorities in support of our refusal to recognize it.

Concerning the third insistence, (c), that of actual knowledge by McCorckle & Son, it would render this opinion too long to detail the testimony upon that point further than to say that Mr. Burns, the manager of the Rockcastle company, and Whaley and Hoskins, each testified that McCorckle & Son were notified of the contract between the lumber company and the Rockcastle company, and all the while had knowledge that the latter company was furnishing money to the former under the terms of the Rockcastle company's contract. There also appear in the record letters from Mr. Burns and from Hoskins to McCorckle & Son containing this information. Furthermore, McCorckle & Son transferred to Whaley and Hoskins, after the Rockcastle company contract, the lease contract upon which the mill was located for the purpose of being transferred to the Rockcastle company, as had been agreed to be done by the lumber company under its contract with the Rockcastle company.

It is true that the McCorckles in a way attempt to deny this testimony, but they do not deny that conversations upon that subject were had, but say that as they understood it no definite arrangements were made whereby the Rockcastle company was to furnish money; but we are convinced that they are mistaken in this, and that they knew all the while that the Rockcastle company was furnishing money to the lumber company, as it was receiving none from any other source, and necessarily they must have known that it was out of that money that their debt was being reduced to $9,000.00. Upon this issue of fact, if the mind of this court should be in doubt, it would be its duty to resolve the doubt in favor of the finding of the chancellor, but not so if the evidence preponderates against his finding. Farmer v. Cornett, 174 Ky. 560, and cases therein referred to. Clearly such preponderance is found in this case.

At this point, however, it is insisted that the Rockcastle company's contract did not make it a purchaser of the lumber. It might be here admitted that there is some doubt as to whether it was a complete purchaser, but it was a *pro tanto* one, obtaining a title or an interest in the lumber to the extent of the amount that it paid on the purchase price. But however this may be, if it was not a purchaser it was then a factor agreeing to make advancements on the lumber and to afterwards dispose of it for its principal, the lumber company. The law is that factors have a lien upon the property of their principals for the advancements made and their commissions. The doctrine is stated in 19 Cyc. 156, as follows: "A factor, in the absence of a special agreement to the contrary, has the personal security of his principal, as well as a lien upon the goods for his advances. . . . A factor has a lien on the goods of his principal in his hands for his compensation and reimbursement." Authorities found in the notes to this text are numerous and fully sustain it. The same doctrine is announced in 11 R. C. L., in this language: "A factor has a general lien upon goods of his principal in his possession, their proceeds and securities taken for the price, for advances, expenses and commissions, and extending to the general balance of his accounts." To this statement in the text is appended a long list of cases from the various states of the Union.

This doctrine is fully recognized and applied by this court in the case of Lafferty v. Hall, 19 Ky. L. R. 1777,

wherein the court, quoting with approval from Story on Agency, section 376, says:

"It is now incontrovertibly established, as a matter of law derived from long usage and admitted without proofs, that factors have a general lien upon every portion of the goods of their principal in their possession, and upon the price of such as are lawfully sold by them and the securities given therefor for the general balance of the accounts between them and their principal, as well as for the charges and disbursements arising upon those particular goods. The lien may also extend to all sums for which a factor has become liable, as surety or otherwise, for his principal, wherever the suretyship has resulted from the nature of the agency, or it has been undertaken upon the footing of such a lien."

We recognize the existence of the pre-requisite fact to the arising of the factor's lien that he must be in possession of the property of his principal, but all the authorities agree that such possession need not be actual only, but may be constructive. 11 R. C. L. 776; 19 Cyc. 160, and the authorities collected in the notes to each.

It is by no means certain but that the Rockcastle company was in the actual possession of the lumber in controversy in this case as it was upon land to which it held the lease by assignment, and, as hereinbefore seen, had been marked in its name. But whether these facts are sufficient to make its possession actual, there can be no controversy but that they are sufficient to give it constructive possession of the lumber. That company, then, being in condition to assert a factor's lien, and having made advancements, as we have seen, with the knowledge of McCorckle & Son, it will not lie in the mouths of the latter to claim a priority over the factor, Rockcastle company, in the proceeds of the lumber on hand when the committee was appointed, to the exclusion of its advancement and charges.

Second. Turning now to the questions raised as between the Harlan Grocery Company and Hackney & Company on the one side, and McClung & Company on the other, we find from the record that McClung & Company would perhaps have been entitled to a prior lien on the proceeds of the property not covered by the liens of McCorckle & Son and the Rockcastle company, under section 2487 of the Kentucky Statutes, if it had taken steps to enforce such lien within the time provided by law, conceding that it established its claim to have been

for the character of goods mentioned in the section of the statute, *supra*. Upon this latter point, the only evidence in the case is a statement filed taken from a letter written by the attorney for the grocery company and the Hackney company to the attorney for McClung & Company, as follows: "If you have a verified account of C. M. McClung showing that you sold to Dione Lumber Company goods recited in the account, I will agree with you that this is sufficient proof of the claim, and this letter shall be my agreement on that point."

It is not altogether clear that this statement intended to dispense with the necessity of proving that the account was made for that character or class of goods giving the seller the lien contended for; but, waiving that question, the record shows that there was no effort made by McClung & Company in any manner to take the necessary steps to enforce its lien within the time provided by the statute giving it.

Section 2490 of the Kentucky Statutes provides that when any company against whom the lien is given by section 2487 shall suspend, sell or transfer its business or its property or effects shall be taken under an attachment or execution, the lien shall attach, and may be immediately enforced, and under the provision of section 2491 the proceeding to enforce it shall be commenced within sixty days from the date of the assignment, suspension or attachment of the property. It was much longer than sixty days after the creditors' committee took charge of the property of the Dione Lumber Company before any steps of any character were taken by McClung & Company to assert its lien. It cannot be seriously disputed but that the turning over of the property to the creditors' committee was tantamount to and in reality was an assignment of the Dione Lumber Company. Its property had already been attached by these appellants, and evidently the time was then at hand when, under section 2491, the lien holder claiming under the provision of section 2487 should bestir himself. It is true that in order to perfect this character of lien no notice need be filed with the county court clerk, as provided by section 2494 of the Kentucky Statutes, as was determined in the case of Hall v. Guthries, 103 S. W. (Ky.) 721, and perhaps other cases, but neither that case nor any other from this court to which our attention has been called dispenses with the necessity to proceed in some manner within sixty days after the assignment or

attachment of the property, as is provided by section 2491 to enforce the lien. On the contrary, in the Guthries case, in speaking of this subject, the court says:

"But this provision (section 2494) has no application in the case of an assignment for the benefit of creditors. The rights of the parties, where an assignment is made for the benefit of creditors (and likewise attachments) are regulated by sections 2487 and 2491." If the case to which we are referred of *in re* Falls City Shirt Mfg. Co., 98 Fed. R. 592, holds to a different construction of section 2491, we do not find ourselves able to agree with it. On the contrary, it is perfectly plain to us that our interpretation of the statutes both in the Guthries case, *supra,* and now is in perfect accord with the language used. The proceedings to enforce the lien which the statute requires to be taken within sixty days need not necessarily take the form of a suit, for when the property is assigned the creditor may make out and verify his claim as required by law, and accompany it by necessary allegations showing the lien and file it with the assignee, which would, according to our view, be a sufficient compliance with the statute. But even this was not done in the instant case.

The effect of this interpretation is attempted to be avoided by McClung & Company through reliance upon a stipulation in the contract wherein the creditors' committee was appointed to the effect and in substance that the proceeds of the property should stand in lieu of the property itself, and that none of the rights of the creditors should be prejudiced by the converting of the property into cash. We are unable to give this stipulation in that contract any further effect than that the proceeds of the property should stand in lieu of it. There is no effort made, nor even an insinuation found, to show that the parties to that contract contemplated dispensing with whatever legal steps might be necessary for the proper adjustment of the rights of the creditors, including the perfecting, as well as asserting, their liens, and we are convinced that it was necessary for McClung & Company, in order to give it the status of a preferred lien holder under section 2487 of the statutes, to have either filed suit for that purpose within sixty days after the appointment of the creditors' committee, or to have filed with that committee within that time proper proof of its claim. Failing in either of these particulars, it lost its right to superiority of the proceeds in contest, and the

Harlan Grocery Company and the Hackney company, having obtained their liens by their attachments, should be adjudged the fund as against McClung & Company.

It results, therefore, that the judgment giving to Mc-Corckle & Son a superior lien over the proceeds of the lumber on hand at the time of the appointment of the creditors' committee to that of the Rockcastle company for the amount of its claim is erroneous, and is now reversed, and the latter company is adjudged to have a superior lien on such proceeds for its debt. The judgment giving to McClung & Company a superior lien on the proceeds of other personal property against which it is asserted over the attachment liens of the Harlan Wholesale Grocery Company and the Hackney company is also erroneous, and is reversed, and the latter companies are adjudged a superior lien over such fund in the order of their attachments, and the court is directed to enter a judgment in conformity with this opinion.